**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| MOLDEX-METRIC, INC., a California corporation, *Plaintiff-Appellant,* v. McKEON PRODUCTS, INC., a Michigan Corporation, *Defendant-Appellee.* | No. 16-55548 D.C. No. 2:11-cv-01742-GHK-AGR OPINION |

Appeal from the United States District Court
for the Central District of California
George H. King, District Judge, Presiding

Argued and Submitted December 5, 2017
Pasadena, California

Filed June 5, 2018

Before: Kim McLane Wardlaw and Ronald M. Gould,
Circuit Judges, and Lawrence L. Piersol,* District Judge.

Opinion by Judge Piersol

---

*The Honorable Lawrence L. Piersol, United States District Judge for the District of South Dakota, sitting by designation.

**SUMMARY**[**]

**Trademark**

The panel reversed the district court's summary judgment in favor of the defendant in a suit for trademark infringement.

Moldex-Metric, Inc., a producer of foam ear plugs with a specific bright green color, alleged that McKeon Products, Inc., infringed its mark by using a similar green color for ear plugs. The district court concluded that the green color mark was functional and thus not protectable as trade dress.

Reversing, the panel held that the existence or nonexistence of alternative designs is probative of functionality or nonfunctionality. Thus, evidence of alternative colors must be considered in deciding the functionality of Moldex's mark. The panel concluded that there remained a dispute of material fact as to whether Moldex's bright green color was functional. The panel vacated the district court's grant of summary judgment and remanded for the district court to consider McKeon's arguments both that Molex's green color lacked secondary meaning and that there was no likelihood of confusion, and then if necessary go to trial.

---

[**] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

**COUNSEL**

Sanford I. Weisburst (argued), Quinn Emanuel Urquhart & Sullivan LLP, New York, New York; Joseph M. Paunovich and Harold A. Barza, Quinn Emanuel Urquhart & Sullivan LLP, Los Angeles, California; for Plaintiff-Appellant.

Steven M. Weinberg (argued) and Michael J. Salvatore, Holmes Weinberg PC, Malibu, California; Robert L. Meylan, Meylan Davitt Jain Arevian & Kim LLP, Los Angeles, California; for Defendant-Appellee.

**OPINION**

Moldex-Metric, Inc. filed suit against McKeon Products, Inc. for trademark infringement. The district court granted summary judgment in favor of McKeon, and Moldex appeals. We reverse and remand.

**I**

Since 1982, Moldex has been producing foam ear plugs with a specific bright green color. The color in question has also been described as fluorescent green-yellow or fluorescent lime. From 1982 through 2011, Moldex sold more than 1.6 billion pairs and $191,917,123.77 worth of the green ear plugs. Moldex has never acquired a federal registration of its green color, but it has sued to enforce the mark against other companies selling ear plugs bearing the green color. After McKeon began using a similar green color for its ear plugs, Moldex initiated this lawsuit in 2011.

The parties filed cross motions for summary judgment. McKeon claimed, among other things, that the green color mark is functional. The district court granted McKeon's motion after finding that the mark is functional, and thus not protectable as trade dress.[1] On March 6, 2015, we vacated and reversed the district court's grant of summary judgment. Expressing doubt that summary judgment on functionality grounds was appropriate, we remanded for the district court to assess functionality in the first instance in light of *Qualitex Co. v. Jacobsen Products, Co.*, 514 U.S. 159 (1995). The dissenting opinion argued that the *Qualitex* standard was both incorporated in the functionality factors set forth in *Disc Golf Ass'n, Inc. v. Champion Discs, Inc.*, 158 F.3d 1002 (9th Cir. 1998),[2] and was addressed by the district court.

On remand, the district court determined that the visibility of Moldex's bright green color is essential to the use or purpose of the ear plugs—to increase visibility and facilitate safety compliance checks—and therefore the green color mark is functional under the tests set forth by the Supreme Court in *Qualitex* and *TrafFix Devices, Inc. v. Marketing Displays, Inc.*, 532 U.S. 23 (2001). The district court again

---

[1] The district court granted summary judgment solely on the ground that Moldex's claimed trademark is functional. It did not reach McKeon's additional arguments for summary judgment based on lack of secondary meaning and no likelihood of confusion.

[2] The *Disc Golf* factors for assessing the functionality of product features are: 1) whether the design yields a utilitarian advantage; 2) whether alternative designs are available; 3) whether advertising touts the utilitarian advantages of the design; and 4) whether the particular design results from a comparatively simple or inexpensive method of manufacture. *Disc Golf*, 158 F.3d at 1006. No single factor is dispositive and all should be weighed collectively. *Id.*

granted summary judgment in favor of McKeon on functionality grounds. Moldex appeals.

## II

We review de novo the district court's grant of summary judgment based on its finding of functionality. *Clicks Billiards, Inc. v. Sixshooters, Inc.*, 251 F.3d 1252, 1257 (9th Cir. 2001). Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED.R.CIV.P. 56(a). In ruling on a motion for summary judgment, "[t]he evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). Viewing the evidence in the light most favorable to Moldex and drawing all reasonable inferences in its favor, "we must determine whether the district court correctly applied the relevant substantive law and whether there are any genuine issues of material fact." *Clicks Billiards*, 251 F.3d at 1257.

## III

The Lanham Act makes actionable the deceptive and misleading use of trademarks to protect persons engaged in commerce against unfair competition. *Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 767–68 (1992); 15 U.S.C. § 1127. This protection extends not only to word marks, but also to the design of a product as a form of trade dress. *See Wal-Mart Stores, Inc. v. Samara Bros., Inc.*, 529 U.S. 205, 209 (2000) (Section 43(a) of the Lanham Act "embrace[s] not just word marks . . . but also 'trade dress' . . . [which] encompass[es] the design of a product."). Trade dress is the "total image of a product," including features such as size,

shape, color, texture, and graphics.  *Disc Golf*, 158 F.3d at 1005 n.3.  Unregistered trade dress such as Moldex's green color may be protected under the Lanham Act.  *See Wal-Mart*, 529 U.S. at 210.

No protection under the Lanham Act is available if the claimed trade dress is functional.  *TrafFix*, 532 U.S. at 29.  For unregistered trade dress, the person who asserts protection "has the burden of proving that the matter sought to be protected is not functional."  15 U.S.C. § 1125(a)(3); *see also Wal-Mart*, 529 U.S. at 214 ("It is true, of course, that the person seeking to exclude new entrants would have to establish the nonfunctionality of the design feature . . . .").  The nonfunctionality requirement of trade dress protection "is based on the judicial theory that there exists a fundamental right to compete through imitation of a competitor's product, which right can only be temporarily denied by the patent or copyright laws."  *Tie Tech, Inc. v. Kinedyne Corp.*, 296 F.3d 778, 785 (9th Cir. 2002) (internal quotation marks and emphasis omitted).  The functionality doctrine is meant to promote free competition by ensuring that patent law remains the only legal source of exclusive rights in utilitarian features.  *See Qualitex*, 514 U.S. at 164.  If a product's functional features could be trademarked, the holder could obtain a monopoly "over such features . . . without regard to whether they qualify as patents and could be extended forever (because trademarks may be renewed in perpetuity)."  *Id.* at 164–65 (citations omitted).

The trademark statutes do not define functionality.  The Supreme Court's traditional test of functionality, articulated in *Inwood Labs*, is that "a product feature is functional if it is essential to the use or purpose of the article or if it affects the cost or quality of the article."  *Inwood Laboratories, Inc. v.*

*Ives Laboratories, Inc.*, 456 U.S. 844, 850 n.10 (1982).  We have observed that "[f]unctional features of a product are features which constitute the actual benefit that the consumer wishes to purchase, as distinguished from an assurance that a particular entity made, sponsored, or endorsed a product." *Disc Golf*, 158 F.3d at 1006 (citation omitted).

In 1995, the Supreme Court held that color may be the subject of trademark protection because "sometimes color is not essential to a product's use or purpose and does not affect cost or quality . . . ."  *Qualitex*, 514 U.S. at 165.  The Court expanded on the traditional rule of *Inwood* and added that a functional feature is one the "exclusive use of [which] would put competitors at a significant non-reputation-related disadvantage." 514 U.S. at 165.  In *Qualitex*, any color at all in general had functionality as there had to be some color on press pads to avoid noticeable stains.  However, no color in particular had functionality, including the green-gold color.  Accordingly, there was no functionality for the particular green-gold color to defeat trademark protection.  *See id.*

In 2001, the Supreme Court explained in *TrafFix* that the *Qualitex* decision did not displace the traditional *Inwood* rule, and the Court reaffirmed that the *Inwood* formulation is the main test to determine functionality.  *See TrafFix*, 532 U.S. at 32–33.  In *TrafFix*, the Supreme Court held that the Sixth Circuit "gave insufficient recognition to the importance of the expired utility patents, and their evidentiary significance, in establishing the functionality of the device"—a dual-spring mechanism for keeping outdoor signs upright in heavy wind conditions.  *Id.* at 32.  The Supreme Court found that the dual-spring design not only served the purpose of informing consumers that the stands were made by the plaintiff, but also "provide[d] a unique and useful mechanism to resist the force

of the wind." *Id.* at 33. Simply put, the design was "the reason the device work[ed]." *Id.* at 34. "The dual-spring design serves the important purpose of keeping the sign upright even in heavy wind conditions; and as confirmed by the statements in the expired patents, it does so in a unique and useful manner. . . . The dual-spring design affects the cost of the device as well; it was acknowledged that the device 'could use three springs but this would unnecessarily increase the cost of the device.'" *Id.* at 31–32.

The *TrafFix* Court ruled that the Sixth Circuit had erred by inquiring into the competitive necessity of the dual-spring design and speculating about other design possibilities where the device was otherwise functional under the *Inwood* formulation. *Id.* at 32–33. The *TrafFix* Court went on to state that, "It is proper to inquire into a 'significant non-reputation-related disadvantage' in cases of esthetic functionality, the question involved in *Qualitex*." *Id.* at 33.

In the present case, the district court distinguished *Qualitex* by asserting the protectable green-gold color in that case was not "essential" to the product because any color would suffice to achieve the product's function of hiding stains on dry-cleaning press pads, whereas the Moldex green color plays a significant role in achieving the function of allowing ear plugs to be seen during safety compliance checks and therefore is "essential" to the use or purpose of the ear plugs. As we explain below, however, whether or not the green color is essential is a question for the jury.

The district court also held that, by virtue of the green color, Moldex's ear plugs work as they are supposed to. Therefore, the green color is functional like the dual-spring mechanism for keeping outdoor signs upright in heavy wind

conditions in *TrafFix*, and there was no need to inquire into alternative colors that are equally visible.

## A

Moldex contends on appeal that the district court misinterpreted *Qualitex* and the Supreme Court's guidance in *TrafFix* regarding the test for functionality. Specifically, Moldex argues that the district court erred in interpreting *TrafFix* to hold that the availability of alternative colors need not be considered to determine whether Moldex's green color is functional if the color contributes in a significant way to the operation of the product. We agree.

McKeon asserts that the district court correctly decided that the *Qualitex* competitive necessity test and its related inquiry into alternative designs is irrelevant in light of the Supreme Court's decision in *TrafFix* and our decision in *Au-Tomotive Gold, Inc. v. Volkswagen of Am., Inc.,* 457 F.3d 1062 (9th Cir. 2006). Addressing aesthetic functionality in *Au-Tomotive Gold*, we stated:

> So where do we stand in the wake of forty years of trademark law scattered with references to aesthetic functionality? After *Qualitex* and *TrafFix*, the test for functionality proceeds in two steps. In the first step, courts inquire whether the alleged "significant non-trademark function" satisfies the *Inwood Laboratories* definition of functionality–"essential to the use or purpose of the article [or] affects [its] cost or quality." If this is the case, the inquiry is over–the feature is functional and not protected. In the

case of a claim of aesthetic functionality, an alternative test inquires whether protection of the feature as a trademark would impose a significant non-reputation-related competitive disadvantage.

*Au-Tomotive Gold*, 457 F.3d at 1072 (citations omitted). The district court and McKeon highlight this language to support the proposition that alternative designs are irrelevant where the trade dress is functional under the traditional *Inwood* definition. Specifically, McKeon argues that the district court properly declined to consider the evidence of alternative colors that are available for ear plugs to perform the same function of visibility as Moldex's bright green color because functionality was clearly established under *Inwood* by the fact that the bright green color improves the visibility of Moldex's ear plugs.

Admittedly, there has been some question whether consideration of alternative designs is required after *TrafFix*. *See*, *e.g.*, *Secalt S.A. v. Wuxi Shenxi Const. Mach. Co.*, 668 F.3d 677, 686–87 (9th Cir. 2012) (noting that the Ninth Circuit's *Disc Golf* factors "are somewhat more expansive than the *Inwood* formulation," but neither accepting nor rejecting the argument that alternative designs need not be considered in determining functionality of a hoist, "a classic example of 'de jure' functionality"), *abrogated on other grounds by SunEarth, Inc. v. Sun Earth Solar Power Co., 839 F.3d 1179 (9th Cir. 2016)*. Notably the plaintiff in *Secalt* provided no legitimate evidence of nonfunctionality, *see* 668 F.3d at 687, 688, yet we considered the lack of alternative designs and decided that the plaintiff failed to meet its burden of demonstrating nonfunctionality. *See id.* at

686 ("[u]nder the second *Disc Golf* factor, a lack of alternative designs favors a finding of functionality").

Post-*TrafFix*, we have continued to consider alternative designs in determining functionality.  First, in a case decided a few months after *TrafFix*, we acknowledged "the difficulty of applying traditional functionality analysis in the restaurant context" and stressed the importance of considering alternative designs in evaluating the functionality of a restaurant's trade dress.  *Clicks Billiards*, 251 F.3d at 1260–61.  We concluded that Clicks "presented sufficient evidence of the arbitrariness and non-functional nature of its restaurant design decisions and the availability of alternative designs to clear the summary judgment hurdle."  *Id.* at 1261.

Later, in a 2003 decision deciding the functionality of a sports drink bottle designed for bicycling, we said that alternative designs cannot negate a trademark's functionality, but they can be used to determine functionality in the first place. *Talking Rain Beverage Co. v. S. Beach Beverage Co.*, 349 F.3d 601, 603 (9th Cir. 2003) ("the existence of alternative designs may indicate whether the trademark itself embodies functional or merely ornamental aspects of the product") (citing *TrafFix*, 532 U.S. at 34).  Because we found strong evidence of functionality in advertising touting the bottle's utilitarian feature, in the cost-effectiveness of the design, and in the utilitarian advantage of the bottle, *see id.* at 603–604, we did not find that the existence of alternative designs was enough to diminish the "indicia of functionality." *Id.* at 605.

In 2006, we addressed the aesthetic functionality doctrine in *Au-Tomotive Gold*.  *Au-Tomotive Gold* "center[ed] on the trademarks of two well-known automobile

manufacturers—Volkswagen and Audi." 457 F.3d at 1064. Au-Tomotive Gold ("Auto Gold") manufactured automobile accessories such as key chains and license plate frames that bore "well-known trademarks, including the names Volkswagen and Audi, the encircled VW logo, the interlocking circles of the Audi logo, and the names of individual car models." *Id.* The trial court found the trademarks aesthetically functional and granted summary judgment in Auto Gold's favor. On appeal, the "central question" was the scope of the doctrine of aesthetic functionality "and its application to the Volkswagen and Audi trademarks as they appear on Auto Gold's products." *Id.* at 1067. Discussing the *Inwood* "utilitarian" formulation that a feature is functional if it is "essential to the use or purpose of the article [or] affects [its] cost or quality," we noted that extending this functionality doctrine which "aims to protect 'useful' product features, to encompass unique logos and insignia is not an easy transition." *Id.*

After reviewing our own cases dealing with aesthetic functionality, and discussing the teachings of *Inwood*, *Qualitex*, and *TrafFix*, we set forth a two-step functionality test. *See id.* at 1072. Under step one, we found no evidence in the record that the marks were functional under the "utilitarian definition in *Inwood Laboratories* as applied in the Ninth Circuit in *Talking Rain*." *Id.* at 1072. Under step two, we examined "whether Volkswagen and Audi's marks, as they appear on Auto Gold's products, perform some function such that the exclusive use of [the marks] would put competitors at a significant non-reputation-related disadvantage." *Id.* at 1072–73 (internal quotations and citations omitted). Under that standard, we found that the Audi and Volkswagen marks were nonfunctional. "[T]here is no evidence that consumers buy Auto Gold's products

solely because of their 'intrinsic' aesthetic appeal. Instead, the alleged aesthetic function is indistinguishable from and tied to the mark's source-identifying nature." *Id.* at 1073–74.

Although the existence of alternative designs was not a consideration when we assessed whether to protect the Volkswagen and Audi logos as trademarks, we again noted in *Au-Tomotive Gold* that, following *TrafFix,* "the existence of alternative designs cannot negate a trademark's functionality," but "may indicate whether the trademark itself embodies functional or merely ornamental aspects of the product." *Id.* at 1071–72, 1072 n.8 (internal quotations and citations omitted).

More recently, in *Millennium Laboratories, Inc. v. Ameritox, Ltd.,* 817 F.3d 1123, 1129 (9th Cir. 2016), we held that the Court in *TrafFix* "did not discredit the *Disc Golf* four-factor test," and we noted that the Ninth Circuit held already in *Automotive Gold* "that the test still applies after *TrafFix* was decided."

The issue in *Millennium* was the functionality of the graphical layout of reports on medical tests. Millennium created an easy-to-read layout for presenting the results of the tests and Ameritox came out with a similar design. Millennium sued Ameritox for trade dress infringement. The district court granted Ameritox's motion for summary judgment after finding that the trade dress of Millennium's design was functional.

On appeal, we noted that most cases applying the *Disc Golf* factors "have focused on physical devices." *Id.* at 1128. Because the *Disc Golf* factors are not easily applied to aesthetic features, in aesthetic trade dress cases we have

"focused our analysis on the *Qualitex* language—whether the protection of the design would put competitors at a disadvantage." *Id.* Recognizing that "we have clarified that this divergence between physical and aesthetic products is not necessary," this court applied *Au-Tomotive Gold's* two-step test to gauge the functionality of Millennium's graphical layout. *Id.* at 1128–29.

In step one this court assessed functionality of Millennium's layout under the four *Disc Golf* factors together. *See id.* at 1130–31. We found neutral the factor "whether the particular design results from a comparatively simple or inexpensive method of manufacture." *Id.* at 1130. We determined that questions of fact existed regarding both whether the design has utilitarian advantage or whether it was aesthetic, and whether Millennium "actually advertised the functionality of its report's format." *Id.* Considering alternative designs such as a "one graph over the other" configuration, or using pie charts rather than the charts used, we held this *Disc Golf* factor also weighed against summary judgment for Ameritox. *Id.* Considering all four *Disc Golf* factors together, we highlighted the significance of the existence of alternative designs for Millennium's layout:

> The key point is that even if a comparison of results is functional, this could be presented in many ways, and the precise format used by company asserting trade dress is not necessarily functional. A reasonable jury could conclude that Millennium's trade dress is not functional under Step One of the *Au-Tomotive Gold* two-step test.

*Id.* at 1130–31. In other words, although Millennium's graphical layout served the function of presenting test results, it was not necessarily functional because there were alternative designs for presenting the information.

In step two of this court's analysis in *Millennium*, we addressed the test for aesthetic functionality—"whether protection of the feature as a trademark would impose a significant non-reputation related competitive disadvantage." *Id.* at 1131 (quoting *Au-Tomotive Gold*, 457 F.3d at 1072). Noting that "aesthetic functionality has been limited to product features that serve an aesthetic purpose wholly independent of any source identifying function," we found that Millennium presented enough evidence to allow a jury to assess the question of aesthetic functionality. *See id.* at 1131. The district court's grant of summary judgment in favor of Ameritox was reversed. *Id.*

Our case law shows that we continue to consider the existence or nonexistence of alternative designs as probative evidence of functionality or nonfunctionality. To gauge functionality of a feature after *TrafFix*, this Court has applied the traditional *Inwood* formulation in conjunction with our *Disc Golf* factors, including whether alternative designs are available. Our cases acknowledge that the *Inwood* test does not always easily apply to some features, and this is true regarding Moldex's green color. In *Inwood* and *TrafFix*, the Supreme Court did not explain what it takes for a feature to be "essential to the use or purpose of a product." And whether a feature is "essential to the use or purpose of a product" is not always as apparent as it was in *TrafFix*, especially in cases such as this where the visibility of Moldex's green color is not the "central advance" of a utility patent and does not equate to the same "strong evidence" of

essentiality as the patents in *TrafFix*, 532 U.S. at 29–30, and where the green color does not affect the cost of ear plugs as compared to the dual-spring device in *TrafFix* that was less expensive than an alternative three-spring device. *Id.* at 31–32. Our cases reflect that, with some features, the availability of alternative designs becomes more important in assessing functionality. *Millennium* is a good example. There, even though the graphical layout served the function of presenting test results in an easy-to-read format, the existence of alternative designs for presenting the information was a factor in our decision that questions of fact existed whether the trade dress was functional.

In *Qualitex*, the Supreme Court proposed that where an aesthetic feature like color serves a function, courts should examine whether the exclusive use of that feature would interfere with competition in order to determine whether it is eligible for trademark protection. *Qualitex*, 514 U.S. at 166 ("Although it is important to use some color on press pads to avoid noticeable stains, the court found no competitive need in the press pad industry for the green-gold color, since other colors are equally usable.") (internal quotation and citation omitted). Considering alternative designs is particularly probative of functionality in a color case like this one where the mark is more akin to the green-gold hue in *Qualitex* than to the dual-spring stand in *TrafFix*. According to Moldex's color expert, there are hundreds of other available colors that could accomplish the goal of making the ear plugs visible during safety compliance checks. Thus, an ear plug manufacturer prohibited from selling Moldex's green shade would still be able to compete in the marketplace.

Under *Qualitex*, *TrafFix*, and our court's own precedent, evidence of alternative colors should be considered in

deciding functionality of the mark in this case, and the district court gave insufficient recognition to the importance of the alternative colors and their evidentiary significance in evaluating the functionality of Moldex's green color mark. Moldex claims twelve Pantone colors it believes to be confusingly similar to its green earplug color. It is not clear from the record what portion of the color spectrum between green and yellow this includes, or what portion of the set of colors that facilitate safety checks this includes. Moldex's expert opines that they are only claiming a small portion of the similar colors, and points to numerous color shades that are equally or more visible than its bright green color. In contrast, McKeon's expert points out that when a company attempts to protect a color by specifying it as a collection of Pantone swatches, it is actually attempting to protect a large chunk of color space that extends, in practice, because of a variety of factors, far beyond the samples. As for safety checks, McKeon argues that yellow is unavailable and orange performs poorly in low illumination, leaving only the green/lime color space, much of which Moldex is seeking to claim. It is argued that the set of colors left for good visibility and cospicuity would be depleted.

Moldex's evidence that numerous color shades are equally or more visible than its bright green color and would result in the same function of visibility during compliance checks weighs against a finding of functionality, and a reasonable jury could conclude that Moldex's green color is not functional. McKeon's evidence includes the fact that the color is not to identify the product but rather is necessary for the earplugs to perform their function, that being that they are especially visible so that it can be confirmed that they are in use. This visibility of these colors during a compliance check indicates the functionality of the colors and that the source of

alternatives is depleted by the claimed colors. Because a reasonable jury could find at *Au-Tomotive Gold* Step One that the evidence of alternative colors outweighs the evidence of Moldex's color providing some utilitarian advantage, and the fact Moldex advertised its utility, and a reasonable jury could then find at Step Two that trademark protection of the color would not impose a significant non-reputation-related competitive disadvantage, there remains a dispute of material fact as to whether Moldex's bright green color is functional. Therefore, summary judgment on functionality was inappropriate.

B

Moldex also argues that the district court failed to comply with this court's mandate by refusing to consider evidence of alternative colors that achieve the same goal as Moldex's green color. We review de novo a district court's compliance with our mandate. *See United States v. Kellington*, 217 F.3d 1084, 1092 (9th Cir. 2000).

On remand, we directed the district court to assess functionality in light of *Qualitex*. Although we expressed doubt that summary judgment should be granted on functionality, we did not mandate a particular result or specifically require the district court to inquire into other available colors. For these reasons, we reject the argument that the district court violated the mandate. *See id.* at 1094 (holding that mandate "leaves to the district court any issue not expressly or impliedly disposed of on appeal") (citations omitted).

In sum, there remains a dispute of material fact as to whether Moldex's bright green color is functional. Therefore, summary judgment was inappropriate.

For the foregoing reasons, we vacate the district court's March 31, 2016 order granting summary judgment to McKeon, and we remand to the district court for the district court to consider McKeon's arguments both that Moldex's green color lacks secondary meaning and that there is no likelihood of confusion, and then if necessary go to trial.

**REVERSED AND REMANDED.**